UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 12 CR 447 |
| v. | ) | |
| | ) | Honorable Robert W. Gettleman |
| RAGHUVEER NAYAK | ) | |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by and through its attorney, ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits its position paper as to sentencing factors, and asks this Court to impose a sentence within the applicable Guidelines range of 70 to 87 months' imprisonment.

## I.    BACKGROUND

Defendant Raghuveer Nayak is a successful businessman with a long history of profiting by engaging in fraud.  He has owned, or currently owns, numerous healthcare-related businesses in Illinois and Indiana, including Lakeshore Surgery Center ("Lakeshore"), Rogers Park One-Day Surgery Center ("Rogers Park"), Merrillville Plaza Surgery Center, Lakeside Surgery Center, Herron Medical Center, Hind General Hospital, Merriville Anesthesia Corporation, Division Medical Diagnostics, Inc., Paulina Anesthesia, Lincoln Park Open MRI LLC, Western Touhy Anesthesia Inc., Delaware Place MRI LLC, Alevio Physical Therapy and Chiropractic LLC, and Illiana Anesthesia LLC.   *See* Presentence Investigation Report ("PSR") at ¶¶ 97, 102.   The focus of this case is defendant's bribery of doctors in the course of his operation of Lakeshore and Rogers Park, both of which are ambulatory surgery centers in the Chicagoland area where surgeons perform outpatient procedures.   *Id.* at ¶ 10.

On September 30, 2013, defendant pleaded guilty to engaging in a scheme to deprive patients of his surgery centers of the honest services of their treating physicians by paying bribes to the physicians who referred patients to or performed surgeries at his surgery centers. Defendant also admitted to corruptly endeavoring to obstruct and impede the due administration of the Internal Revenue Code, including by instructing physicians not to report the bribes to the Internal Revenue Service ("IRS"). *See* R.88 (Superseding Information); R.91 (Plea Agreement); PSR at ¶¶ 4-6.

Notably, as he admits, defendant paid cash bribes to at least five high-volume doctors who referred patients to Lakeshore and Rogers Park, in amounts that reflected the value of the surgery to defendant's profit margins. At his first opportunity for contrition, however, defendant still refuses to accept responsibility for the full scope of his bribery scheme. Significantly, the government's evidence—summarized in the government's version of defendant's offense, submitted to the Probation Office on October 4, 2013; the supplemental government's version, submitted to the Probation Office on January 8, 2014 (collectively, "GV"); and the attached reports of interview and supporting documents—shows that defendant's scheme was far more sophisticated than simply slipping cash to doctors. The scheme included an elaborate arrangement by which he provided business checks to friend Rajinder Bedi in exchange for untraceable cash in the amount of 70% of the checks' value, serving the dual purpose of providing a source of cash for bribes and allowing defendant to deduct the checks as business expenses on his federal tax returns. And, for the highest grossing surgeons for whom cash payments for patients were impracticable, the scheme also included an arrangement between defendant and at least four doctors whereby defendant paid advertising expenses on

2

behalf of the doctors, in exchange for patient referrals.   The scheme spanned almost a decade and, in short, consisted of defendant putting his desire for profit ahead of the rights of patients being treated at his surgery centers.   PSR at ¶¶ 10-11, 14, 56-58.

More specifically, as further detailed in the government's version of the offense, defendant's crimes included the following:

### A.  Defendant Paid Cash Bribes to Doctors In Exchange for Patient Referrals

Defendant admits that, over a period of time spanning almost a decade, he paid cash bribes to doctors in exchange for patients they referred to Lakeshore and Rogers Park.   R.91 at 3.   To these doctors defendant paid cash of $100 to $400 per patient (in addition to the professional fees the doctors and the surgery center separately billed the patient or the patient's insurance company), which directly reflected the volume of surgeries the doctors performed at defendant's facilities.  *See generally* GV, Exhs. 1-5 (reports of interview and grand jury statements of doctors who received cash bribes from defendant[1]).   As discussed further below, neither defendant nor the doctors disclosed the bribes to the patients who underwent surgery at Lakeshore or Rogers Park, and most of the patients were not offered a choice of facility by the doctor, even though defendant's surgery centers were out of the network of most major insurance carriers, such as Blue Cross Blue Shield.  *See, e.g.,* GV, Exh. 2 (Dr. A admitting that he accepted cash payments but did not tell his patients, or anyone else, about the cash payments); GV, Exh. 18 (reports of interviews of patients who relayed that they were not given a choice of

---

[1]     Throughout this motion, the government refers to uncharged individuals by alphabetical labels ("Doctor __") instead of their identities, consistent with the abbreviations used in the *Santiago* proffer.  R.76.  The government will provide the true identity of the names of individuals who are not disclosed in this motion to the Court and to counsel for defendant in a filing under seal, attached hereto as Exhibit A.

location at which to have the surgery performed). Indeed, defendant admits that he intended to influence the doctors' medical motives without the patient being informed of that outside influence. R.91 at 3.

Examples of five doctors who accepted cash bribes from defendant in exchange for patient referrals are highlighted in the government's version at pages 3-5. Most of these arrangements spanned multiple years, and they yielded for defendant's surgery centers more than 400 surgeries. GV, Exhs. 1-5.

Defendant's illicit arrangement to obtain untraceable cash from then-friend Rajinder Bedi over six years, however, strongly suggests that defendant's cash bribery practices were not limited to a mere five doctors. As Bedi has described at great length (GV, Exh. 14), and as the government anticipates he will testify at defendant's sentencing hearing, for about six years, Bedi and defendant engaged in a scheme to generate untraceable cash for defendant.

In short, starting in 2002 and continuing until 2008, defendant gave Bedi a total of approximately $2.014 million in checks, written variously from defendant's healthcare businesses, including Illiana Anesthesia, Lakeshore, Merrillville Plaza Surgery Center, Delaware Place MRI, Western Touhy Anesthesia, Paulina Anesthesia, Rogers Park, and Division Medical. The $2 million sum was not in exchange for work Bedi did for these businesses—it was purely fraud on the government, motivated by his cash-for-referral arrangements with practicing physicians. As further explained on page 10 of the government's version, grand jury subpoenas of the businesses revealed no invoices, no work product, no payroll documents, and no contracts indicating that Bedi was employed or contracted by any of defendant's businesses. Defendant directed his accountant to classify the checks to Bedi as business expenses by writing "ADV" on

4

the checks to signify that it was for an advertising expense; as a result, the checks were deducted on defendant's entities' federal tax returns, resulting in tax savings of about 30%. GV, Exh. 16 (defendant's accountant reporting that, on multiple occasions, defendant directed him that, if a check had an ADV notation on the memo line, this meant defendant wanted him to categorize the check as an advertising expense; with respect to the Bedi checks, either ADV was on the memo line, or the accountant would call defendant to inquire about the check's classification).

Pursuant to a conversation with defendant, Bedi then obtained cash for defendant representing the non-deductible value of the checks, which was about 70% of $2.014 million. GV, Exh. 14. As the government anticipates IRS Revenue Agent Shari Schindler will testify at sentencing, and as set forth in the table on page 12 of the government's version, this is corroborated by Bedi's bank records, which show that Bedi generated cash of not less than $1.27 million between 2003 and 2008—a practice that stopped abruptly when former-Governor Rod Blagojevich was arrested in December 2008 and Bedi and defendant both came under scrutiny.

That defendant's cash bribery was not limited to the five doctors who have come forward and admitted their receipt of bribes also is demonstrated by the numerous doctors who have had conversations with defendant in which defendant offered them cash bribes, in exchange for patient referrals, but they rejected defendant's offer. For example, Drs. L and M, partners in a chiropractic practice, have recounted a meeting with defendant during which defendant offered them cash of $150 to $300 in exchange for patients they referred for diagnostic tests, the amount of cash depending on the type of test. *See* GV, Exhs. 19-20 (doctors' reports of interview).

Likewise, defendant offered Dr. N, a primary care physician, cash in exchange for patient referrals to his surgery centers. During a private conversation at Dr. N's office, defendant

bragged to Dr. N about his political connections, including to Blagojevich, and then pulled out a business card and said words to the effect of, "Let's talk business." Defendant explained that he wanted Dr. N's patient referrals for surgeries, and that he would pay cash for each referral—$100 to $200 for small surgeries, $200 to $300 for minor surgeries, and $400 to $500 for extensive surgeries—and wrote these same numbers on the business card for the doctor to review. *See* GV, Exh. 21 (Dr. N's reports of interview). Dr. N also recounted a conversation with defendant during which defendant was complaining about his cash bribes to three doctors he called the "Three Amigos." *Id.* Defendant had paid one of the three amigos cash in exchange for patient referrals, intending that the money be split amongst the doctors, but one of the doctors had kept the cash for himself, causing the other doctors to call defendant and demand their split. *Id.*

### B. Defendant Paid Bribes to Doctors in the Form of Advertising Funds In Exchange for Patient Referrals.

As summarized in the PSR, defendant's bribery scheme was more sophisticated than simply slipping cash to doctors. PSR at ¶ 11. Particularly for the highest-volume doctors—those who performed hundreds of surgeries each year at Lakeshore and Rogers Park—it was not practicable or economical for defendant to pay cash for patients. Instead, defendant entered into arrangements with these doctors under which he agreed to pay for their advertising expenses, in exchange for which the doctors agreed to refer their patients to Lakeshore or Rogers Park for outpatient surgeries. In turn, defendant deducted the advertising expenses as business expenses on his tax returns, reducing his taxable income. *See* GV, Exh. 17.

6

Four examples of doctors to whom defendant paid bribes in the form of advertising funds are detailed on pages 5-8 of the government's version. As these doctors have explained, the advertising expenses defendant paid on their behalf were business expenses that, for the most part, the doctor otherwise would have paid themselves. *See, e.g.,* GV, Exh. 8. In most cases, defendant was explicit that the money was in exchange for patient referrals. *See, e.g.,* GV, Exh. 6. The vast majority of the advertising was exclusively for the doctor's private practice and made no mention of defendant's surgery centers. *See, e.g.,* GV, Exh. 8 ("I did not feel like I had to mention Nayak's surgery centers in my advertising. Nayak never asked me to include his surgery centers in the advertising I did with the money he gave me."). And in all cases, the doctors receiving the advertising money did not disclose this fact to their patients, even though it affected their medical motives. GV, Exhs. 6-13. Indeed, in at least one case, the doctor agreed to send his patients to Rogers Park and Lakeshore based on the undisclosed advertising money he would be receiving from defendant, without first visiting the surgery centers and with no independent knowledge of their quality or staffing. GV, Exh. 6 ("I accepted Nayak's offer at the meeting. At that point, I had not yet visited Rogers Park. The reason that I decided to perform my surgical procedures at Rogers Park was because of the advertising money that Nayak was offering").

## II.   THE CORRECT GUIDELINES CALCULATION SHOULD BE 70-87 MONTHS' IMPRISONMENT.

The government agrees with the Probation Officer's Guidelines calculations.   PSR at ¶¶ 23-59.   As the PSR outlines, defendant's advisory Guidelines range should be 70-87 months, calculated as follows:

For Count One (honest services fraud), the base offense level is 8 under Guideline § 2B4.1(a), which governs cases involving commercial bribery.   *Id.* at ¶ 27.   Pursuant to Guideline §§ 2B4.1(b)(1)(B) and 2B1.1(b)(1)(J), the offense level is increased by 18 levels because the value of the bribes paid to doctors (at least approximately $3.2 million) exceeded $2.5 million but was less than $7 million, resulting in a total offense level for Count One of 26. *Id.* at ¶¶ 30, 37.

More specifically, as outlined in the tables on page 15 of the government's version, over the course of his scheme, defendant paid cash bribes to doctors of at least $85,000 and bribes in the form of advertising money of at least approximately $3.14 million.[2]  *See* GV, Exh. 22 (advertising invoices).

This is a highly conservative estimate.   First, it includes only the cash paid to those five doctors who have been willing to admit taking bribes from defendant.   These doctors have zero incentive to falsely admit to receiving cash bribes, but doctors who have denied receiving cash

---

[2]        In the government's version, the government estimated, based on invoices from a media company, that defendant paid advertising expenses on behalf of Drs. I and O totaling approximately $2,896,500.   The government now revises that estimate downwards slightly, to $2,848,000, having excluded—out of an abundance of caution—those invoices that leave doubt as to whether the money was exclusively for the benefit of those two doctors.   For example, invoice # T-362 includes the name of a third doctor with a question mark; invoices # T-736 and T-746 include "PAML" production costs in the invoice. Conservatively, these invoices have been excluded.   Accordingly, the total advertising payments defendant made on behalf of the four advertising doctors is approximately $3,144,000.

from defendant have all of the incentives in the world to preserve their reputation and medical license by denying conduct as difficult to prove as cash payments. Second, the government has calculated the value of the bribes using the low end of the range provided by doctors. For example, one doctor estimated that defendant paid him cash bribes for patients approximately two to three times per year, in a lump sum totaling $1,000 to $5,000 on each occasion, over the course of about four years. The government estimated, conservatively, that this doctor received $8,000 in cash from defendant, rather than the high-end $60,000 that could have been supported by his statement. GV, Exh. 4. Likewise, with respect to the advertising invoices, the government included only those payments that unambiguously were for the advertising of a doctor who has admitted receiving bribes from defendant.

For Count Two (tax fraud), the base offense level is 20, pursuant to Guideline §§ 2T1.1(a)(1) and 2T4.1(H). This is based on a total tax loss of $729,657, consisting of two categories of fraudulent conduct: (1) defendant's corrupt endeavor to impede the IRS in its efforts to collect taxes from the recipients of his cash bribes; and (2) defendant's tax fraud scheme with Rajinder Bedi, which was part of the same bribery and obstruction scheme as the endeavor charged in Count Two of the Superseding Information.

More specifically, as defendant admits, one of the reasons that defendant paid doctors bribes in the form of cash was to avoid detection and to impede the IRS in collecting taxes on those bribes. Defendant did not issue Forms 1099 to the doctors to whom he paid bribes, and he even told one of the doctors that he should not report the income to the IRS. *See* GV, Exh. 1 ("Nayak … said that he had already paid taxes on the cash that he provided to me, so I did not have to pay taxes on the cash."). The tax loss associated with this conduct is the unpaid taxes

9

due on the cash bribes. As discussed above, the government conservatively has estimated that defendant paid cash bribes of at least approximately $85,000. The IRS has not undertaken an analysis of the taxes due and owing from each of the five cash doctors. Accordingly, pursuant to Guideline § 2T1.1(c)(1), Note (A), the tax loss should be treated as 28% of the unreported gross income, which is $23,800. PSR at ¶ 41.

With respect to defendant's tax-fraud scheme with Bedi, IRS Revenue Agent Shari Schindler conducted an audit of the federal tax returns of defendant and his corporate entities for tax years 2003 through 2008 to determine the tax due and owing.[3] Her analysis revealed that defendant deducted checks to Bedi and his entities of approximately $2.014 million (for which defendant received cash at a rate of 70%) as business expenses of defendant's entities, and that the vast majority of the checks reflect on the memo line that they were for "adv" or "advertising." *See* GV, Exh. 15 (representative sample of checks to Bedi). Schindler subtracted these deductions from the reported business expenses of defendant's companies because they were not legitimate expenses, but instead were part of a scheme to defraud the IRS and generate untraceable cash to pay doctors in exchange for referrals, resulting in a tax due and owing for tax years 2003 through 2008 of $705,857.[4] PSR at ¶ 42.

---

[3] Defendant has indicated that he intends to contest Revenue Agent Schindler's analysis at sentencing. Accordingly, at this time, the government plans to call her to testify at the sentencing hearing, including regarding her trace analysis of Bedi's bank accounts and her determination of the tax due and owing from the scheme.

[4] In the PSR, the Probation Officer notes that the 2008 return she received from defendant differs from the 2008 return filed with the IRS and used by Revenue Agent Schindler for her calculations, and characterizes the version she received from defendant as an "amended 2008 income tax return." PSR at ¶¶ 42, 121 ("an amended income tax return was filed due to adjustments for foreign interest income and an increase in business income"). This is incorrect. Defendant provided to the Probation Office a copy of a 2008 federal income tax return that was never filed with the IRS. The IRS's transcript for tax year 2008

Accordingly, pursuant to Guideline §§ 2T1.1(a)(1) and 2T4.1(H), the offense level for Count Two is 20. Tax and non-tax offenses do not group. *See United States v. Vucko*, 473 F.3d 773, 781 (7th Cir. 2007) (tax and non-tax conduct should not be grouped, in part because it "would … eliminate the marginal punishment for [defendant's] second offense"). Accordingly, pursuant to Guideline § 3D1.4(b), Count One (with an offense level of 26) is one Unit and Count Two (with an offense level of 20) is one-half Unit, resulting in an adjusted offense level of 27.

In anticipation of defendant's arguments regarding the proper calculation of the advisory Guidelines range, the government sets forth below the law and evidence supporting the Probation Office's calculation.

## A. The Guideline Applicable to Defendant's Bribery Scheme is § 2B4.1.

The Guidelines provision applicable to Count One is § 2B4.1, which governs commercial bribery and honest services fraud that does not involve a public official. *See* Guideline § 2B4.1, Application Note 1. The government understands defendant's current position to be that Guideline § 2B1.1, rather than Guideline § 2B4.1, is applicable to his criminal conduct. This position is incompatible with governing case law. The Seventh Circuit has held that the relevant question in determining the applicability of § 2B4.1 is whether the crime was akin to "straight fraud," in which case § 2B1.1 applies, or more closely resembles "fraud achieved through bribery," in which case the bribery guideline, § 2B4.1, applies. *United States v. Lanas*, 324 F.3d 894, 905 (7th Cir. 2003). This is true regardless of the statute under which a defendant was prosecuted: A defendant convicted of mail fraud should nonetheless be

---

shows the filing of only a single return (the one used by Revenue Agent Schindler for her calculations), with no amended return ever having been filed.

sentenced for bribery if bribery was the "essence" of his or her criminal conduct. *United States v. Serpico*, 320 F.3d 691, 697-98 (7th Cir. 2003) (holding that district courts should "find an appropriate guideline section to fit the conduct (not just the charge)" and disregard the "name attached to the statute violated").

For example, in *Lanas,* the Court held that the "core" of defendant's conduct, which included soliciting and accepting bribes from various sellers and thereby depriving customers of the purchasing agent's honest services, "more closely resemble[d] fraud achieved through bribery" and thus was governed by Guideline § 2B4.1, even though he was convicted of mail fraud. 324 F.3d at 905. Likewise, in *Serpico*, the Court applied the bribery guidelines because, although defendant was convicted of mail fraud, the conduct in question—a kickback scheme to obtain a favorable loan—was "closer to bribery" than straight fraud. 320 F.3d 691 at 697-98. And in *United States v. Montani*, 204 F.3d 761, 769-70 (7th Cir. 2000), defendant was sentenced under the bribery guideline because his offense conduct—a bribery scheme involving liquidated furniture that was prosecuted as mail fraud—"more closely resembled a fraud achieved through bribery than a straight fraud." *See also, e.g., United States v. Jain*, 93 F.3d 436, 442-43 (8th Cir. 1996) (affirming use of Guideline § 2B4.1 in sentencing psychologist who received payment from a hospital in exchange for referring patients).

The same result holds here, too. The central focus of the charges against defendant is not "straight fraud," which would be governed by Guideline § 2B1.1. He has been convicted of paying bribes to doctors, in the form of cash payments that were in exchange for surgeries the doctors performed at defendant's surgery centers. In other words, defendant was secretly

paying remuneration to induce doctors to breach their duty of loyalty to patients—the essence of commercial bribery.   *Lanas*, 324 F.3d at 904-05.

### B. Defendant's Bribes to Doctors in the Form of Advertising Money Should Be Included as Part of His Scheme Conduct.

The government expects that the defense will argue that the value of the bribes paid to doctors under Guideline § 2B4.1(b) should not include the approximately $3.1 million in advertising funds defendant paid to or on behalf of doctors because those bribes, unlike the cash bribes, were somehow legal.   This is simply incorrect.   The evidence plainly establishes that the $3.1 million in advertising funds was part of defendant's overall scheme to pay for patients, without the existence of the bribe being disclosed to the patient to whom the bribe recipient owed a fiduciary duty.   Defendant paid for advertising to ensure that the surgeons in question brought their patients to Lakeshore and Rogers Park, instead of the many other outpatient surgery centers in the Chicagoland area.   Without this money greasing the wheels of the surgeons' medical decisionmaking, there was a risk that patients would be referred by the surgeons to the hospitals at which they had surgical privileges or other surgery centers, thus limiting defendant's profits.[5] *See, e.g.,* GV, Exh. 6 (Dr. I acknowledging that "the reason that [he] decided to perform [his] surgical procedures at Rogers Park was because of the advertising money that Nayak was offering"); GV, Exh. 8 (Dr. J acknowledging that "the reason [he] chose Nayak's surgery centers to do [his] procedures was because of the payments that Nayak provided to me").

---

[5]   If defendant continues to maintain that advertising money should not be included in the total value of the bribes he paid to doctors under Guideline § 2B4.1, the government will call at least one of the doctor-recipients of advertising funds to testify at sentencing regarding the bribes they received in the form of advertising money from defendant.

Indeed, the example of Dr. B proves that defendant viewed the cash and advertising bribes as largely interchangeable.  In around 2002, defendant starting paying Dr. B cash bribes in exchange for Dr. B conducting surgical procedures at Rogers Park.  Then, in 2004, defendant brought up the idea with Dr. B that, in lieu of cash, he would pay for Dr. B's advertising expenses. For this purpose, defendant gave Dr. B a few $10,000 checks, which Dr. B used for marketing, and which Dr. B understood served exactly the same purpose as the cash—to influence his decision of where to bring his patients for surgical procedures.   At some point later in 2004, their arrangement reverted back to cash bribes.  GV, Exh. 1.

In that way, this case is similar to *United States v. Borrasi*, where a doctor was paid bribes, including in the form of putting his medical staff on the hospital's payroll, thus reducing the business expenses the medical practice otherwise would have sustained.  The Seventh Circuit affirmed the conviction and held that, even though actual professional services were rendered, the payments were nonetheless bribes because they were intended to induce patient referrals by giving the doctor a monetary benefit.   639 F.3d 774, 782 (7th Cir. 2011).   Likewise, in *United States v. Rogan*, the doctors received various illegal benefits, including money for office construction and payments for advertising of the doctors' private practice.   The Court held that these were bribes, in violation of various federal statutes, because the money induced referrals.   459 F.Supp.2d 692 (N.D.Ill. 2006*), aff'd*, 517 F.3d 449 (7th Cir. 2008).   Here, too, although under the guise of advertising, defendant was providing a monetary benefit to doctors that he intended would cause the doctors to refer patients to Lakeshore and Rogers Park.

In addition, defendant's objection ignores his conduct after the federal investigation came to light.   If defendant thought that his conduct was legal, he wouldn't have done what he did,

which was to create bogus contracts to make the advertising payments to doctors appear legitimate. Defendant approached at least three of the four advertising doctors discussed on pages 5-8 of the government's version and presented fake, backdated contracts, disguising the advertising payments as salaries for work the doctors purportedly performed at Lakeshore and Rogers Park as "chiefs" of their respective divisions. As each of these doctors has explained, they did no such work. GV, Exhs. 6-9, 13. Instead, as they acknowledge (against their best interest), the money received from defendant for advertising was financial compensation for patient referrals. *See, e.g,* GV, Exhs. 8 ("The contract does not accurately reflect my position with Rogers Park, the duties I performed for Rogers Park, the length of time that I worked at Rogers Park, or the reason that I was receiving money from Nayak.").

### C. The Losses Caused by Defendant's Cash-Generation Scheme with Rajinder Bedi Should Be Included As Tax Loss Under Guidelines §§ 2T1.1 and 2T4.1.

The government expects that defendant will argue that the tax loss caused by his illegal deduction of checks to Bedi as business expenses should not be considered for sentencing purposes. First, to the extent that defendant argues that any illegal scheme to generate cash with Bedi was part of a separate scheme, that would be incorrect. The Guidelines define relevant conduct to include all of defendant's acts and omissions that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense. U.S.S.G. § 1B1.3(a)(1). As this Court found when it denied defendant's motion to sever the tax and healthcare-related fraud counts of the indictment (R.51), defendant's tax scheme with Bedi was intertwined with the bribery scheme. Defendant's illegal arrangement with Bedi was the mechanism by which he

15

obtained the untraceable cash he used to pay doctors cash bribes.  R.1.  It was part of his preparation for and execution of the healthcare bribery scheme of which he was convicted.

Second, to the extent that defendant argues that Bedi is simply lying, the government will call Bedi to testify at the sentencing hearing, during which testimony he will explain the background of his relationship with defendant, his initial loan from defendant, his agreement with defendant to repay that loan using cash, their agreement to have Bedi receive checks from defendant's entities and turn around about 70% of the cash in the form of cash, and the execution of that scheme over the course of about six years.

Furthermore, it would be difficult, if not impossible, to reconcile defendant's position that Bedi is lying with Revenue Agent Schindler's trace analysis of Bedi's bank accounts, which show that Bedi generated cash approximating 70% of the value of the checks he received from defendant over a six-year period—and then abruptly stopped when the scheme ended in 2009. This is not a mere coincidence.   Starting when defendant's first checks to Bedi were received, Bedi began to withdraw and otherwise convert money to cash in his personal and business accounts using various methods including: (1) withdrawing cash; (2) cashing checks from one of his companies, Extra Wide Sock Company; (3) cashing State of Illinois travel reimbursement checks; (4) collecting cash rents from tenants in buildings he owned; (5) obtaining cash from home equity loans in his own name; and (6) obtaining cash from a friend's home equity line of credit.   In total, as summarized by the chart on page 12 of the government's version, these sources account for the withdrawal of cash totaling not less than $1.27 million between 2003 and 2008.   Then, at the end of 2008, when the scheme ended because of the arrest of former-Governor Rod Blagojevich, Bedi's conduct changed substantially.   He stopped

16

withdrawing cash.   He stopped cashing checks from his business.   He stopped cashing travel reimbursement checks. He stopped making cash withdrawals from his own and his friend's home equity lines of credit.   And, for the first time in seven years, he started depositing cash received from tenants.   All of this proves, by a preponderance of the evidence, that defendant's tax-fraud scheme with Bedi should be included in the tax loss calculations as relevant conduct.

**D.  Defendant is Not Entitled to An Adjustment for Acceptance of Responsibility.**

If defendant continues to deny responsibility for paying doctors bribes in the form of advertising funds and for his tax-fraud scheme with Rajinder Bedi, he should not receive a reduction in his offense level for acceptance of responsibility under Guideline § 3E1.1.   PSR at ¶ 21.

To be eligible for a two-level reduction under Guideline § 3E1.1(a), a defendant must "clearly demonstrate[ ] acceptance of responsibility for his offense."   The section's commentary states that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. n. 1(a); *see also United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007) (reduction may be withheld from a defendant who denies his relevant conduct in the face of reliable evidence); *United States v. Zehm,* 217 F.3d 506, 515-16 (7th Cir. 2000) (same).   A defendant bears the burden of proving his acceptance by a preponderance of the evidence. *United States v. Lister*, 432 F.3d 754, 759 (7th Cir. 2005).

It is the government's understanding that, at this time, defendant disclaims all responsibility for paying doctors bribes in the form of advertising money and for unlawfully converting checks to cash, using Bedi as an intermediary.   Given that this is conduct that was

part of the charged scheme, or is relevant conduct that was intertwined with offense conduct, defendant should not receive credit for having accepting responsibility for his crimes.

## III.     APPLICATION OF SECTION 3553(a) FACTORS

The facts of this case, together with the factors set forth in 18 U.S.C. § 3553(a)—in particular, the need to reflect the value our society places on the integrity of our medical professionals, the harm that is caused when that integrity is lost, and defendant's other past actions indicating a profound lack of respect for the law—demands a meaningful sentence of incarceration within the applicable Guidelines range.

### A. The Nature of Defendant's Crimes Weighs Strongly In Favor of a Within-Guidelines Sentence of Incarceration.

1. <u>Motivated by greed, defendant destroyed the integrity of medical professionals obligated to act in the best interest of their patients.</u>

Defendant corrupted the doctors to whom he paid bribes, and did so selfishly out of pure greed. As defendant admits, the success of Rogers Park and Lakeshore depended on doctors sending their patients for surgery there, instead of at a competitor surgery center or a hospital, contributing to the surgery centers' great successes in the mid-2000's. R.91 at 2. To facilitate the success of his businesses, and to ensure that profits flowed to him personally, defendant bribed doctors by handing them cash under the table and by paying hundreds of thousands of dollars each year for their advertising. He did so secretly, typically making the payments in person when he was alone with doctors, making hand gestures to doctors that he did not want them to discuss the payments with anyone, and even instructing one doctor not to disclose the cash bribes to investigators and providing a check for the doctor's legal services in connection with the federal investigation. PSR at ¶ 18.

This conduct should not be treated lightly. Medical professionals play a major role in determining the type, quality, and quantity of healthcare services a patient may require. When a physician makes a medical decision, such as where to conduct a surgery, in exchange for money, the integrity of the patient-provider relationship and the healthcare system more generally is compromised. When physicians have a financial motive to refer, or to provide care at a particular location, this incentive can affect utilization, patient choice, and competition. In addition, where medical decisions regarding the location of a surgery are controlled by those receiving bribes, the medical marketplace suffers since new competitors can no longer win business with superior quality, service, or price. *See Health Care Financing Administration Proposed Rules*, 63 Fed. Reg. 1659, 1662 (Jan. 9, 1998). In short, medical decisions should be made solely in the best interests of the patient, on the basis of medical necessity and quality of service, and not compromised or influenced by a profit motive. *D.A.B. v. Brown*, 570 N.W.2d 168, 170 (Minn. Ct. App. 1997) ("It is well accepted that patients deserve medical opinions about treatment plans and referrals unsullied by conflicting motives.").

This is particularly important in light of the type of bribes paid in this case. The patients of the doctors who took bribes from defendant unanimously said that they would have wanted to know if their treating surgeon was taking a bribe in exchange for bringing them to a particular center for surgery. *See, e.g.,* GV, Exh. 18. This makes sense: The bribes in question were not to influence a medical decision arguably insignificant to a patient, such as the choice of a lab that processes a blood test, or some other medical formality that happens behind the scenes. The bribe was to influence one of the most significant of choices regarding a person's medical care—where a surgery will be conducted. At the same time, defendant structured the

19

transaction purposefully to ensure that the existence of the bribe—that is, defendant's role in influencing the location of the surgery—would be concealed from the most important player in the transaction, the patient.

Defendant knew that he was affecting the integrity of important medical decisionmaking when he was paying high-volume doctors cash and advertising money for their referrals. In his plea colloquy, he admitted that he intended to induce doctors to make a particular medical decision about the location of surgery without disclosing the outside influence to the patient, in violation of the doctor's duty to the patient. And this is further demonstrated by his elaborate scheme to cover-up the advertising payments by executing backdated contracts with the doctors that reflected that the doctors were being paid for bogus tasks they purportedly did at the surgery centers as chiefs or directors of their area of medicine. PSR at ¶ 19. Although the government has not sought an obstruction enhancement, this conduct should be taken into account under § 3553(a) in evaluating the nature of the offense because it shows the dishonest and fraudulent lengths to which defendant was willing to go to keep the scheme going and hidden.

> 2. Defendant's past conduct, including using his money and political connections to attempt to buy power, indicates a profound disrespect for the law.

Defendant's willingness to corrupt is evident not only in his efforts to interfere with the doctor-patient relationship but also to interfere with the relationship between politician and public for his own personal gain. In both contexts, he has proven that he believes money buys influence. More specifically, in addition to the bribes that are the subject of this case, defendant was an integral participant in the scheme with former-Governor Rod Blagojevich to exchange money for the prospective appointment of former congressman Jesse Jackson, Jr., to the U.S.

Senate seat vacated by then-President-Elect Obama. A member of his Indian community steering committee and a key fundraiser, defendant was a source of funding for the bribe, which he made clear in conversations with Robert Blagojevich, Bedi, and others. Defendant's role is detailed both in the intercepted calls that formed the basis of the criminal charges against Blagojevich and in Bedi's testimony in the Blagojevich trial.[6]

Starting in the early 2000s and continuing through 2008, Bedi was a fundraiser for Blagojevich because of his role within the Indian community. *See* GV, Exh. 23 at 7, 10-16 (transcript of testimony from *United States v. Blagojevich*, No. 08 CR 888 (July 7, 2010)). Bedi testified that defendant was his long-time friend and also was very active in donating money to and organizing money for political campaigns. *Id.* at 17-18, 21. For example, Bedi met Jesse Jackson, Jr., through defendant and attended various events at defendant's home, at which Jackson and Blagojevich also were present. *Id.* at 23, 25. He described the relationship between defendant and Jackson as "[v]ery close," *id.* at 25, and recounted a breakfast meeting between himself, Jackson, and defendant at a downtown Chicago restaurant on October 28, 2008, during which defendant and Jackson discussed Jackson's interest in being appointed by Blagojevich to the Senate seat and the role fundraising could play in that appointment. *Id.* at 28-31, 46-47. More specifically, at this breakfast meeting, Jackson expressed his desire to be appointed to the Senate seat and defendant told him that he would raise $1 million for Blagojevich if Blagojevich appointed Jackson to the Senate. *See* GV, Exh. 24.

After this breakfast meeting, also on October 28, 2008, Bedi attended a pre-arranged

---

[6]    Bedi also testified in the Blagojevich trial about his agreement with defendant to generate cash for 70% of the value of business checks he received from defendant. GV, Exh. 23 at 19-22.

meeting with Robert Blagojevich to discuss an upcoming Indian fundraiser.    GV, Exh. 23 at 47.

During that meeting, Bedi relayed to Robert that defendant was very interested in having Jackson

appointed to the Senate seat and that defendant could raise a lot of money.    *Id.* at 49-50.

Robert told Bedi that Jackson's appointment was unlikely, but that defendant could speak with

the governor about it himself.    *Id.* at 51.    Then, in a telephone conversation intercepted

pursuant to court order later that same day, Robert told his brother, Rod, "here's the big issue he

came up with . . . it has to do with a particular person who is lobbying to be the Senator, um, and

wants to talk to you about his resume, Jackson.    And Raghu Nayak, evidently supported it and

he had communicated through Rajinder [Bedi] that if in fact, um, that would be the case, ah there

would be some accelerated fund-raising on your behalf between now and the end of the year

through his network."

Three days later, on October 31, 2008, there was an Indian fundraiser for Blagojevich

that Bedi and defendant had assisted in organizing.    GV, Exh. 23 at 52-55.    At the event, Bedi

observed defendant having private conversations with both Robert and Rod Blagojevich,

separately.    *Id.* at 56.    After the event, defendant told Bedi that he spoke with Robert about

how interested he was in seeing Jackson appointed to the Senate.    GV, Exh. 24.

On December 4, 2008, Rod Blagojevich spoke with Robert and said that he might be

"elevating" Jackson on the list of candidates for the open Senate seat if he could get something

"tangible up front."    The former governor instructed his brother to reach out to defendant and

tell him that Jackson was a realistic candidate, but that if he's going to be chosen, "some of this

stuffs gotta start happening now … right now … and we gotta see it.    You understand?"

Blagojevich also cautioned to "be careful how you express that and assume everybody's

22

listening, the whole world is listening," so he should "do it in person," and not over the phone. But he repeated that defendant needed to be told that if there is "tangible political support like you've said, start showing us now." Robert called defendant the same day and asked him to "have some coffee together" to "follow up on those brief conversations we had earlier in the month or late last month." They agreed to meet the following day.

Then, the next day, the Chicago Tribune ran a front-page story about the investigation, foiling the plans to secure money from defendant. Blagojevich called his brother and told him to "undo your Raghu [Nayak] thing." After this phone call, Robert called defendant and called off their meeting.

In short, in these conversations and through his offer of campaign donations in exchange for a political appointment, defendant corrupted the political process. Along with the other participants in the scheme, defendant's actions worked to undermine the faith that our citizens deserve to have in the honesty of their government. More significantly for the purposes of the instant sentencing, these interactions reveal his character as a person who appears to believe that money buys power—consistent with the approach he adopted in soliciting business for his surgery centers. This extensive corruption, and the damage he caused to the integrity of medical professionals and Illinois government alike, weighs strongly in favor of a within-Guidelines sentence of incarceration.

**B. A Guidelines Sentence is Necessary to Provide Deterrence.**

This Court should give significant weight to the need to provide general deterrence to others who may commit future crimes of this sort. *See* 18 U.S.C. § 3553(a)(2)(B). The government anticipates that defendant will ask for a sentence of probation or an insubstantial

term of incarceration.   This would send a message that efforts to corrupt the medical practice, and others, may be excused.   In contrast, a meaningful sentence of incarceration would send a strong message of deterrence to those who are tempted to corrupt by paying bribes.   Such a sentence would demonstrate that, no matter how much money you accumulate, or how many businesses you own, or how many friends you enjoy, there is no protection from prison when you are caught corrupting.

In this context, where private insurance companies and the government must rely on the truthfulness of the information submitted by health care providers, the concept of deterrence is more than theoretical.   Fraud and abuse is rampant in the healthcare system; it continues to occur, seemingly unabated, at staggering levels.   This is true in the context of private healthcare, as it is in the context of government healthcare programs.   *See, e.g., Medical Fraud a Growing Problem*, Washington Post (June 13, 2008), available at http://www.washingtonpost.com/wp-dyn/content/article/2008/06/12/AR2008061203915.html; www.cms.gov/Newsroom Center (July 26, 2013) (fraud using home healthcare companies so pervasive that the Centers for Medicare and Medicaid Services temporarily halted the enrollment of new home health providers in the Chicago metropolitan area).   This Court will be sending a message with defendant's sentence about the repercussions of bribing a doctor to obtain patients, and it imperative for the public and the medical community to know that individuals will be prosecuted and punished when they intentionally abuse the system.

Furthermore, the need for deterrence in circumstances such as these is especially great in light of investigating and prosecuting the kind of cash and secret-handshake deals that are the core of this case.   But for an extensive investigation in which various doctors cooperated

against defendant, aided by the timing of the Blagojevich trial in which Bedi was a cooperating witness, this would have been a difficult prosecution to make. Meaningful sentences may well be the most effective way to deter owners of surgery centers and similar facilities who commit extensive healthcare fraud in secret, believing they will get away with it.

The need for deterrence is particularly strong with respect to a person like defendant, who exercises considerable influence in the medical community. He owns or has owned a wide variety of medical institutions—blood labs, radiology practices, anesthesia practices, surgery centers, and hospitals. And by his actions described above, he has proven himself to be resilient and obstinate in his use of bribes to achieve his success.

**C. Defendant's History and Characteristics Warrant a Guidelines Sentence.**

Defendant benefited from every possible advantage as he grew up. He had a "fantastic" relationship with his parents and siblings, and his upbringing and current family life appears to be devoid of any major issues. PSR at ¶¶ 69-75. He is well-educated, having earned bachelor's and master's degrees in pharmacy and becoming registered as a pharmacist in the early 1980's. PSR at ¶¶ 92-93. And he is exceedingly wealthy, reporting assets exceeding $27 million and an annual income that, during the height of his bribery scheme, approached $10 million. PSR at ¶¶ 97, 100. Notwithstanding these many advantages, at age 46, defendant began the instant bribery scheme. While he has no other criminal convictions, the length and nature of the charged scheme, combined with his dogged determination to pay illegal benefits and the lack of contrition for the full scope of the scheme, shows he is not deterred by the wisdom that typically accompanies a person's age or experience.

25

IV.    **RESTITUTION AND FINE AMOUNTS**

The government does not seek restitution stemming from defendant's bribery scheme. The victims were the patients, who were deprived of the intangible right to the honest services of their treating physician—a harm that cannot be measured monetarily.   In lieu of restitution, for this conduct, the government urges the Court to impose a fine of $250,000, which is the maximum permissible under statute.   PSR at ¶ 130; *see also* PSR at ¶ 117 (six medical clinics, worth more than $8 million, may be liquidated by defendant to satisfy any fine imposed).

With respect to defendant's tax fraud, however, the government seeks restitution for the tax losses caused by defendant as a condition of defendant's supervised release, in the total amount of $729,657.   *See United States v. Hassebrock*, 663 F.3d 906, 923-24 (7th Cir. 2011) (restitution for outstanding tax liabilities is not mandatory under Title 26 but may be ordered as a condition of supervised release); PSR at ¶ 134.   In light of defendant's significant assets, the government requests that the conditions of supervised release include an order to make a lump sum payment of $729,657, due upon release.

**V.      CONCLUSION**

For the reasons stated above, the government respectfully requests that this Court sentence defendant within the applicable Guidelines range of 70 to 87 months' imprisonment.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:     s/ Andrianna D. Kastanek
        ANDRIANNA D. KASTANEK
        CARRIE HAMILTON
        JEFFREY PERCONTE
        Assistant U.S. Attorneys
        219 South Dearborn Street, Room 500
        Chicago, Illinois 60604
        (312) 353-5300